JACOB RUBY, Appellee, v. EDWARD LAWSON, Appellant.

HUSBAND AND WIFE: Enticing and Alienating—Seduction—
1 Evidence—Sufficiency. Evidence reviewed, and held sufficient

to establish the seduction of a wife and the alienation of her affections.

SALINGER, J., dissents.

SEDUCTION:    Acts Constituting—Arts Employed—Circumstances of Parties.    Whether the arts, etc., employed to seduce a married woman were sufficient to accomplish that purpose must be judged from the position in life of the victim.

HUSBAND AND WIFE:    Criminal Conversation—Previous Unchastity of Wife—Effect.    Unchastity of the wife *previous* to an 'act of criminal conversation with her, while pleadable in mitigation of damages, is no *defense* to an action by the husband for damages by reason of such act, when the husband had no knowledge of such unchastity.

HUSBAND AND WIFE:    Criminal Conversation—Verdict—$100—Excessiveness—Degraded Nature of Parties.    Verdict of $100 as damages for criminal conversation sustained as non-excessive, even though the environments of the parties to the action were degraded.

SALINGER, J., dissents.

*Appeal from Polk District Court.*—W. H. MCHENRY, Judge.

FEBRUARY 16, 1918.

THE defendant appeals from a judgment of $100 on a demand for $10,000 for having alienated the affections of plaintiff's wife.—*Affirmed.*

*J. D. Laws,* for appellant.

*Neiman & Neiman,* for appellee.

LADD, J.—This is an action for criminal

1. HUSBAND AND WIFE: enticing and alienating: seduction: evidence: sufficiency.

conversation, in which appellant contends that the evidence was insufficient to sustain the verdict, in that: (1) Plaintiff's wife was without affection for him, and therefore alienation was impossible; (2) no arts were practiced by defendant to alienate; and (3) no damages were proven.

Plaintiff was married to his wife Oc-
2. SEDUCTION:     tober 31, 1896. There were born to them
acts consti-
tuting: arts     eight children. Until her acquaintance
employed: cir-
cumstances       with defendant, they appear to have lived
of parties.
together happily, save that he had left her,
two or three years previously, when living in Keokuk Coun-
ty, for several months, though with sufficient funds for the
maintenance of the family. Upon arrest for wife desertion,
he brought the entire family to Des Moines, where they
have since resided. From August 22, 1914, they occupied
the second story of defendant's house as tenants, and there-
after, defendant visited her frequently. This is not denied,
nor is there conflict in the evidence as to defendant's having
accompanied her "down town," to picture shows, to the po-
tato patch to aid in hoeing, to another house, unoccupied,
belonging to him, and treating her to candy, bananas, and
apples, and at one time buying her a 98-cent hat, a 50-cent
fascinator, and a 10-cent pair of stockings. Whether these
gifts occurred before or subsequent to the first yielding to
his embraces she is somewhat confused, though sure that
he gave her as much as 50 cents after each of several indul-
gences. Moreover, she swore that defendant told her that
he liked her "better than any woman he ever saw or ever
would see. He said it more than once. I thought pretty
well of him." True, she had previously declared that she
"never did love Lawson;" that she "never thought very
much of him;" that he "never took my affection, but I did
his;" but later, she explained that, though she "did not love
him," she "thought pretty well of him," "right smart of
him," "had affection for him;" that she thought him "a nice
man," "loved him some." From this, the jury might have
found that he had ingratiated himself somewhat into the
graces of this woman, and, as she declared,—though he de-
nied,—indulged in sexual intercourse with more or less
frequency during a period of about 18 months.

It may be that the arts said to have been practiced were somewhat crude, but the jury might have found them sufficient to lead this woman from virtue's way, and this was enough; and it is idle to argue that the evidence did not warrant a finding that defendant so intended. If she first yielded on the mere asking, this was after previous intimacy, and, as might have been found, the sort of flattery calculated to touch the feminine heart. Nor will the circumstance that they indulged in an outhouse or tent or vacant dwelling house, or even in a potato patch, obviate this; for these resorts cannot be said to be other than such persons are likely to choose.

3. HUSBAND AND WIFE: criminal conversation: previous unchastity of wife: effect.

The defendant was a common laborer and ditch digger, who, through industry and economy, had acquired the house in which plaintiff lived and another; and she, the wife and housekeeper of another common laborer, who, though industrious, could scarcely have earned enough to sustain his family.

That persons so situated might resort to such places for the gratification of their passions is not unlikely. Nor is the acceptance of presents as small as 50 cents by a woman in such circumstances to be regarded as peculiarly degrading, so much so as to brand her as a prostitute, or as having been without affections. Though to be denounced as immoral, such matters are not necessarily to be construed as indicating previous unchastity on the part of the woman. Even if the jury might have found her to have been of previous unchastity, there was no evidence of plaintiff's knowledge thereof or consent thereto; and therefore, proof thereof would not have constituted a defense. *Stumm v. Hummel,* 39 Iowa 478. It would have been a proper matter to consider in mitigation of damages (*Smith v. Hockenberry,* 138 Mich. 129 [101 N. W. 207], and cases collected in 21 Cyc. 1632), had the matter been so pleaded. *Frank*

*v. Berry,* 128 Iowa 223. The record contains no plea in mitigation, and her character in this respect was not in issue. Again, it is argued that plaintiff was unkind to his wife. If he spoke roughly to her, even to indulging in profanity, or joked coarsely at her expense, it is to be said, in extenuation, that both, apparently, were uneducated, and, neither through natural inclination nor environment, likely to exhibit much consideration or sentiment for the opposite sex. The attachment of each for the other may have been more physical than ethical,—more Plutonic than Platonic; but such as it was, might not lawfully be interfered with by defendant. She testified that she had always loved her husband, and, though this was in her peculiar way, proof of its quality, to be considered in measuring the damages, may not be interposed as a defense. The credibility of the several witnesses was for the determination of the jury, and its finding that defendant had induced violation of the marital obligations has such support in the evidence as to preclude interference with the verdict. Nor can it be said that the damages allowed ought to have been no more than nominal. The natural mortification and sense of shame usually incident to such wrongs would exact more than that. The consequent loss of comfort in the wife's society and the impairment of her affections, such as they were, ought not to be thus arbitrarily measured. As declared in *Torre v. Summers,* 2 Nott & McC. (S. C.) 270 (10 Am. Dec. 599) :

4. HUSBAND AND WIFE : criminal conversation : verdict : $100 : excessiveness : degraded nature of parties.

"Would the seducer ask himself what damages would requite him, were he the injured husband, he would probably conclude that, as the brutal ravisher of a woman should be prepared to meet death, so the deliberate seducer of his neighbor's wife cannot look for less than pecuniary ruin; and he would then, too, admit that society should be as ready to recompense the injured husband and to punish

his wrongdoer, as the immediate sufferer himself. Would he, when practicing arts of seduction, but ask himself what would be his feelings were his wife or his daughter defiled, even the gallant, gay 'Lothario, warm with the Tuscan grape and high in blood,' might pause, reflect, and say to himself, 'I will not for this end, and to her ruin, seek the weak Calista, to break the peace even of Horatio, though I love him not. I will not be the villain's spider of society, to watch where weakness strays, and to weave meshes on the way, that innocence may be entrapped. I will not be the reptile that unpitying sees the agony which follows from [the agency of his snares.' "

Damages such as may be awarded can but inadequately compensate for such a wrong; and for this reason, courts rarely, if ever, interfere with the measure meted out by the jury. We discover no ground for regarding the verdict unsupported by the evidence, or excessive in the damages allowed.—*Affirmed.*

PRESTON, C. J., WEAVER, GAYNOR, and STEVENS, JJ., concur.

SALINGER, J. (dissenting). I. The first count of the petition alleges that, by various described arts employed by the defendant, he alienated an existing virtuous and mutual attachment, and plaintiff seeks to recover because this caused an entire loss of the companionship, society, and affection of the wife. The gravamen of the second count is that seduction deprived plaintiff of the society, affection, and services of the wife. The preliminary statement in the majority opinion is that we have an action for alienating the affections of plaintiff's wife. A further statement is that we have an action for criminal conversation. The defense is: (1) That the verdict is not sustained by the evidence; (2) that plaintiff's wife was without affection for him, wherefore, alienation was impossible; (3) no arts to

alienate were practiced by defendant; (4) no damages were proved; (5) the verdict is excessive.

II.   It will conduce to clarity to take these claims up in the order that I do.   Was there any evidence from which a jury could find a seduction?   This involves whether there was previous chastity.   The statement of the majority that alleging want of chastity would have sustained a plea in mitigation, had one been interposed, does not dispose of this question.   There can be no justified recovery for 'seduction where it appears there was no prior chastity; and it seems to be conceded there can be no recovery for seduction unless seductive arts were practiced, and obtained a yielding.   In recognition of this, the majority says the jury could find that defendant "had ingratiated himself into the graces of this woman, and had induced violation of the marital obligation;" that, while "the arts said to have been practiced were crude, the jury might have found them sufficient to lead this woman from virtue's ways, and this is enough;" and that it is idle to argue that the evidence did not warrant a finding "that defendant so intended."   This brings me to inquiring whether there was chastity to destroy, and what seductive arts, crude or otherwise, calculated to lead a virtuous woman astray, are exhibited in the evidence. The majority asserts that, "if she first yielded on the mere asking, this was after previous intimacy;" that plaintiff's wife swore "defendant told her he liked her better than any woman he ever saw or would see," and said it more than once; and that, "if she first yielded on the mere asking, this was after previous intimacy, and, as might have been found, the sort of flattery calculated to touch the feminine heart."   Incredible as it is, in the light of the record presently to be exhibited, the majority is of opinion that here is a case where a cold-blooded seducer is seeking to escape from making what reparation money can make for the ruin his wiles have wrought.   It holds that the following,

taken from *Torre v. Summers,* 10 Am. Dec. 599, is appropriate: "So the deliberate seducer of his neighbor's wife cannot look for less than pecuniary ruin;" and if the seducer, "when practicing arts of seduction, would but ask himself what would be his feelings were his wife or his daughter defiled," he would pause and reflect, and say to himself, "I will not for this end and to her ruin seek the weak Calista, to break the peace even of Horatio, though I love him not. I will not be the villain's spider of society, to watch where weakness strays and to weave meshes on the way, that innocence may be entrapped. I will not be the reptile that unpitying sees the agony which follows from the agency of his snares."

In the case before us, there was no previous intimacy, and the affections of the plaintiff's wife were never engaged, unless it is evidence that she was overcome by the seducer's arousing of her love that at times she swears she was thus overcome, and at others, more or less explicitly denies it. On this head, the majority confesses she swore she "never did love Lawson;" that she "never thought very much of him;" that he "never took my affection, but I did his." Whether seductive arts aroused the woman's affection is made a jury question despite, or rather because of, this variety in testifying; because, after swearing there was no affection, she made a qualified denial of this statement, by saying, "I thought pretty well of him, right smart of him, had affection for him, thought him a nice man, loved him some."

Coming to details as to seductive arts, the majority says there is evidence that defendant took the woman to shows, and went with her to get groceries; but it is further undisputed that, when she went, it was in company with some of her children, and on invitation from her husband. It is true there is also no conflict as to her accompanying him to a potato patch to help him hoe, and to an unoccu-

pied house that belonged to him. But it is also undisputed that all this occurred *after* unlawful commerce had been established, assuming there was such commerce.

She claims he gave her money, aggregating some $10 or $15, and in small sums. This he denies. It is, however, admitted that he made her some presents of candy, bananas, and apples. It is undisputed that, at one time, he bought her a 98-cent hat, a 50-cent fascinator, and a 10-cent pair of stockings. While the opinion points this out, it fails to state that the buying of the stockings occurred when Mrs. Ruby's boy was with her; that they came to be bought because Mrs. Ruby told defendant she had no stockings,— had nothing but the legs. It fails to advert to defendant's undisputed explanation of the buying of the fascinator: that the oldest daughter got one; that thereupon Mrs. Ruby said she wished she had one,—that she had nothing to wear,—whereupon defendant told her to pick it out, and he would pay for it, and she did so.

It is, of course, highly material what seductive effect these trifling gifts had, and even more material whether they were made before any intercourse was had. Mrs. Ruby testifies that she "did not love him on account of the presents." She swears positively that all the presents were given *after* illicit connection was had; she testifies that, "up to that time, he had not made me any presents, and had not given me anything that night; had not given me anything up to that time. These presents that he gave me, of the stockings and the money, was after the first time." To even matters up, she then testifies that "the presents were made before the first connection. This trifling conflict on so vital a matter, a matter as to which one would think the woman could not well be mistaken, the opinion disposes of with the polite statement:

"Whether these gifts occurred before or subsequent to first yielding to his embraces she is somewhat confused,

though sure he gave her as much as 50 cents after each of several indulgences."

Having investigated the paths the seducer traveled and the means he employed, we reach for consideration whether, in view of how the woman describes the success of the siege, there was any necessity for laying siege to one who had been married for more than twenty years, and had eight children, the oldest nineteen, and the youngest three years old.

### 2-a

The "seduction" has remarkable features: The first connection occurred after what, on the record, was just an acquaintance of three or four months. The woman says she had "some" affection for defendant; that she never did love him; never thought very much of him; "never thought nothing of him;" that he "never took my affection." In this state of her mind, he arranged with her to go outside, at eight on a winter night, to an ordinary privy. He went in first.

"All the arrangements were made there at the closet; he just wanted to do that act and I let him do it, and that's all there was to it the first time; he did the act on the seat; I was sitting on the seat; I had on all my clothes and he had on all his."

For the first and the second connection, he paid each time 50 cents, and after the act. Substantially all the commerce occurred in this closet. Were this all not a bad showing, the woman adds what has been set out as to the state of her affections, and that, "up to that time, he had not made me any presents, and had not given me anything that night;" also that, before that night, "he gave me things. He gave me some money. He bought me stockings before the first time;" also, that he "had not given me anything up to that time; these presents that he gave me of the

stockings and the money was after the first time."

Assume, for the sake of argument, that the plaintiff suffered some damage, yet he is entitled to nothing on the count for seduction, because there was no seduction. Of this, more hereafter.

III. Is a verdict finding naked adultery without seduction sustained by the evidence? The answer depends almost wholly on whether Mrs. Ruby can be believed against the denial of the defendant. It appears without dispute that this suit was brought after defendant brought suit to eject plaintiff and his wife for nonpayment of rent; that plaintiff told his wife he would harm her physically, unless she testified as he directed. The woman perjured herself. Defendant had or else did not have her affections. He gave her the presents either before or after the intercourse. She testified on these heads both ways. She testified falsely either at one time or the other. It has bearing on credibility that the wife swears that, when the husband abandoned her in Keokuk County, he left her $500 or $600 for her support, and she was not on the county; while he says he left her but $250, and that she and the family did become paupers; that she complained of her poverty, became a county charge, and *was* supported by the county.

The general rule that the credibility of witnesses is for the jury was never intended to cover cases where the jury is bound to find that, on material points, those who are vitally interested and have great bias against the other party have so testified as that, if they speak the truth at one moment, they must have spoken falsely the other. It was never intended to cover cases wherein the wife of a plaintiff who sues for the alienation of her affections testifies both that she did and did not have affection for her alleged seducer; wherein she testifies positively, at one time, that the seductive arts were all practiced after the seduction, and at another, that they were practiced prior there-

to. And as I shall presently attempt to show, the verdict itself, for which said general rule is invoked, indicates that this witness was not believed by the jury. I am of opinion the evidence fails to show there was any intercourse.

IV. Passing all this, I think the verdict, though but $100, is excessive, and there should be a reversal on that account. Whether the verdict is excessive involves what there was to alienate. Speaking almost altogether by way of stating a conclusion, plaintiff and his wife testified to what tends to show there was marital happiness to disturb, and affection to be alienated. Against these exclusions, there is the testimony of Mrs. Munday that she heard plaintiff curse his wife,—call her names; heard him say to her, "God damn you, get up and build the fire and get breakfast;" heard him use the word "bitch," and heard him call her a bitch and a whore. The only denial of this testimony of Mrs. Ruby that she always loved her husband, and was always happy with him, and that he treated her good;—that is, that he got her as much "as he could afford to get;" that her husband would not curse her when they quarreled; that he never cursed her very much; that he cursed her some; and also, that he never cursed her at all. The defendant testified—and there is no substantial conflict upon it—that the husband used violent and profane language toward the wife, and "cussed" her, called her a "bitch" several times; and that she was heard to fall down stairs. Though a witness who heard it thought the parties were joking, it appears without dispute that, in the presence of this party, of the defendant, and of their children, plaintiff asked defendant why he did not take this woman and go off with her; that defendant answered, he did not want to; and that plaintiff replied that the wife was not worth a dime, and he would sell her for fifty cents. Without any attempt of explanation that it was a joke, or any other

explanation, a Mrs. Munday testifies she heard plaintiff say he was going to go away sometime and leave Lawson with the wife and children, and that she heard plaintiff tell her son, a widower, that plaintiff would sell his wife for fifty cents.

It is material how much such affection as this was disturbed. The testimony on this is that the affection of the wife "began to change a little" in 1915; that since then, the parties have lived apart; she has not done what she ought to do; that, in the past, she was an early riser, and built the fires, while he lay in bed; that now she lags, and doesn't get up at all, and he has to call her to get her up; that since, she has not prepared the meals regularly as she always did before; and that since, she has not cared for the children as well as before.

It is to this record the majority is speaking; it is this sensitive husband who is being considered; it is this virtuous wife that is in mind when it is said:

"Nor can it be said that the damages allowed ought to have been no more than nominal. The natural mortification and sense of shame usually incident to such wrongs would exact more than that. The consequent loss of comfort in the wife's society, and the impairment of her affections, such as they were, ought not to be thus arbitrarily measured."

In my view, the plaintiff himself truly fixed his loss at from ten to fifty cents—and any allowance beyond this is purely captious.

One has but to refer to the statement of the victim of the seducer's art, and to her own description of what occurred when seductive arts accomplished their purpose, to become abidingly satisfied that no jury was justified in finding that seductive arts were used; that they were necessary; that a virtuous woman was betrayed; that, on part of the woman, there was anything more than vul-

garly yielding to her own gross animal desires.  If seduc-
tion was yielded to here, every compliance in a bagnio
is a yielding to seduction.  So far from attaching any
importance to the verdict, the verdict itself demonstrates
that the cause of the plaintiff is impeached and tainted,
and that the jury was more influenced by a desire to cast
the costs where they might be paid than by the belief
that a cause of action had, in its substance, been made
out.  Had the jury believed plaintiff's wife was chaste until
the defendant overcame her; had it believed that there was
any affection to alienate, and that defendant had alien-
ated it; had it believed that anything had been done that
caused the plaintiff any suffering or substantial loss, there
would not have been an award of $100 on a claim of
$10,000.  We said, in *State v. Barkley,* 129 Iowa 484, at
485, that a verdict "may involve the credit to be given the
witnesses for the State to such an extent as that it should
not be allowed to stand;" and that this is so "where prose-
cutrix's story was incredible, and the finding of the
jury can be held to indicate that her story must have been
rejected." If it can be said there is any substantial con-
flict, yet the impartial mind must become abidingly satis-
fied that the verdict rests upon something other than the
weight of the evidence.  The testimony of plaintiff and of
his wife is so self-contradictory on material matters,—all
of the evidence is inherently so weak, has so little persua-
siveness, so clearly indicates there was no affection to alien-
ate, and no effort needed to alienate it,—that permitting
a recovery will serve no purpose save the encouragement
of litigation that should never be begun.  A recovery is ut-
terly against substantial justice and right.  The most that
can be found is that the plaintiff had a wife, and that de-
fendant had illicit relations with her.

In bald legal effect, the case does not differ from one
based on a claim that, where a married prostitute has com-

merce for hire, with the implied consent of her husband, he may use the courts to give him damages because, as the result of the illicit intercourse, the husband finds himself deprived of sharing the embraces of the woman in common with others. It was never intended that courts of justice would secure pay for the naked loss of indulgence in sexual intercourse.

That the district and the Supreme Court have been forced to consider such a suit as this is deplorable. That, upon serious appellate consideration, a recovery should be had, would make a mockery of our appellate powers, and come close to being a judicial scandal, and against sound public policy. This court should not be a mere recorder of verdicts. No strained conception of rules of review should be permitted to encourage litigants who state publicly that their wife is worth but an insignificant sum, and invite others to live with her by allowing them to amend that estimate, and to place a high money value on animal rights. The rights of the State are not involved. We. are dealing with private profiteering in the loss of animal rights.

I am of opinion the jury should, instead of allowing $100 for injury sustained by plaintiff, have allowed him nothing, because he lost nothing to which the law gives any value. Wherefore, I would reverse.